UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ESTATE OF JUAN CARLOS ANDRADE RODRIGUEZ,
EXECUTOR MARCO ANTONIO RODRIGO DE LA TORRE,

      Plaintiff,

v.                                                           Case No. 13-01559

UNITED STATES OF AMERICA,

      Defendant.

### OPINION AND ORDER GRANTING SUMMARY JUDGMENT

Plaintiff, as executor of Juan Carlos Andrade Rodriguez's estate, filed this action for damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 and § 2674. Before the court is a motion for summary judgment filed by Defendant United States of America. (Dkt. # 88.) The motion is fully briefed and a hearing is unnecessary. *See* N.D. Ohio LR 7.1(g). For the reasons stated below, the court will grant Defendant's motion.

### I. BACKGROUND

The following facts are undisputed unless otherwise noted. Juan Carlos Andrade Rodriguez was incarcerated at the Northeast Ohio Correctional Center ("NEOCC") on February 19, 2010, until he was deported to Mexico in January of 2011. (Dkt. # 1.) NEOCC is a private prison facility owned and operated by the Corrections Corporation of America ("CCA"). (Dkt. # 43, Pg. ID 2464; Dkt. # 49, Pg. ID 2557.) CCA contracted with the United States Marshals Service ("USMS") to detain persons charged with violations of federal law. (Dkt. # 43, Pg. ID 2464.) Under the contract, CCA was to provide inmates with 24-hour, on-site medical care from licensed medical professionals

and to maintain accreditation with the American Correctional Association ("ACA"). (Dkt. # 43-2, Pg. ID 2475–77.) The contract also required CCA to obtain pre-authorization from USMS for non-emergency off-site medical care. (Dkt. # 43-2, Pg. ID 2476.) USMS approved all such off-site care requests. (Dkt. # 43-1, Pg. ID 2473; Dkt. # 86-3, Pg. ID 3112–16.) CCA maintained their accreditation with the ACA throughout Rodriguez's incarceration. (Dkt. # 86-1, Pg. ID 2855.) NEOCC was subject to quality assurance reviews by the ACA and the Office of Federal Detention Trustee ("OFDT") to rate NEOCC's compliance with national standards. (*Id.*at Pg. ID 2855–63.) Both ACA and OFDT determined that NEOCC complied with the mandatory requirements, including the requirements concerning medical care. (*Id.*)

Rodriguez suffered from Type I diabetes and required almost constant attention to monitor and maintain his health. When Rodriguez entered NEOCC, his blood glucose level was measured at over 500 mg/dl, several times the 80-130 mg/dl recommended by the American Diabetes association. (Dkt. # 101-2, Pg. ID 3814.) Shortly after entering NEOCC, the medical staff administered a Hemoglobin A1c test to measure his average blood glucose levels over 90 days. (Dkt. # 86-4, Pg. ID 3123–24.) A normal test result is between 6.5 and 7.5%. (*Id.*) Rodriguez's test result was 10.5%. (*Id.* at 3125.) The hemoglobin A1c test was administered several more times throughout Rodriguez's incarceration, and his score improved to 6.7% in or around December 2010. (*Id.*)

Doctor Armond Minotti was primarily responsible for treating Rodriguez during his incarceration. (Dkt. # 86-4, Pg. ID 3127–29.) In his deposition, Dr. Minotti testified that Rodriquez was repeatedly noncompliant with treatment. In particular, Dr. Minotti pointed to several instances where Rodriguez failed or refused to eat when taking insulin and to

2

maintain a diabetic diet. (*Id.* at 3127–29; 3147–49; 3150–53.) Additionally, Rodriguez refused IV fluids, vital sign checks, and insulin on multiple occasions. (*Id.* at 3201–17.) Each time Rodriguez refused a specific treatment, he signed documentation provided by NEOCC medical staff indicating that he was acting against medical advice. (*Id.*) Rodriguez's noncompliance with his medical treatment plan led to periodic instances where medical staff found Rodriguez unresponsive in his cell. (*Id.* at 3156–64.) NEOCC medical staff placed Rodriguez in a medical observation unit because of the difficulty controlling his diet and blood sugar levels, exacerbated by Rodriguez's noncompliance with treatment. (*Id.* at 3143.) Rodriguez was in the medical observation unit for an aggregate of 200 days while he was at NEOCC. (*Id.* at 3179.)

Rodriguez was diagnosed with severe eye and kidney ailments. Rodriguez initially complained about vision problems early into his detention at NEOCC. (Dkt. # 84-1, Pg. ID 2821.) In April and May of 2010, an ophthalmologist saw Rodriguez and concluded that he had severe diabetic retinopathy and micro-aneurysms in his eyes. (Dkt. # 86-4, Pg. ID at 3149.) The visiting optometrist suggested that Rodriguez see a vitro-retinal specialist because he was concerned about Rodriguez's eyes and diabetes. (Dkt. # 86-2, Pg. ID 2952.) USMS approved Rodriguez's visit with a retinal specialist on May 7, 2010. (*Id.* at 3008.) Over the next few months, Rodriguez received multiple laser surgeries on both of his eyes in order to treat his retinopathy. (*Id.* at 3014–22.) USMS approved all of the laser surgery procedures. (*Id.*) Rodriguez also saw a kidney specialist, who noticed elevated protein levels in Rodriguez's urine, an indication of poor kidney health. (Dkt. # 86-4, Pg. ID 3165–68). In his expert report, Dr. Minotti determined that Rodriguez's advanced retinopathy and kidney failure were pre-existing conditions,

3

caused by poor diabetes management prior to his incarceration. (Dkt. # 84-1, Pg. ID 2819.) Rodriguez also displayed swelling in his legs as well as high blood pressure, high triglyceride levels, and protein in his initial urinalysis—all signs of kidney damage. (*Id.* at 2819–20.) Dr. Minotti concluded that Rodriguez did not consistently control his diabetes before his incarceration because the types of eye and kidney ailments affecting Rodriguez take years to develop. (*Id.* at 2819–21.)

Rodriguez was removed from NEOCC for deportation to Mexico on January 3, 2011. (Dkt. # 42, Pg. ID 2430–31.) Rodriguez continued to receive medical treatment for his diabetes while he was in Mexico. (Dkt. # 88-5, Pg. ID 3639.)

Rodriguez initiated this action on July 18, 2013, claiming negligence and medical malpractice. (Dkt. # 1, Pg. ID 10–15.) Rodriguez died on July 4, 2014. (Dkt. # 42, Pg. ID 2431.) After Rodriguez's death, Plaintiff filed an amended complaint substituting Rodriguez's estate as Plaintiff and asserting wrongful death and medical malpractice. (Dkt. # 42, Pg. ID 2433–34.) Plaintiff argues that the medical care Rodriquez received at NEOCC was inadequate and his death was a result of the inadequate medical care. (*Id.*) Plaintiff also claims that Defendant was negligent for placing Rodriquez in NEOCC because the facility could not adequately provide for his medical needs. (*Id.*) Alongside its answer to the amended complaint, Defendant filed a third-party claim against CCA seeking indemnification. (Dkt. # 43, Pg. ID 2467.)

On February 19, 2016, the court entered a scheduling order governing the dates for the production of expert reports and the close of discovery. (Dkt. # 56.) The court set a September 23, 2016 deadline for the parties to submit expert reports, 56 days before the close of discovery. (*See id.*) The court subsequently granted an unopposed motion

4

to extend the scheduling order filed by Defendants, and pushed back the expert report deadline to October 10, 2016. (Dkt. # 73.) Plaintiff failed to produce an expert report by the October deadline. (Dkt. # 100, Pg. ID 3723.) On December 16, 2016, Plaintiff filed a motion to extend time to produce its expert report, 71 days after the relevant deadline had passed. (Dkt. # 87.) The court denied Plaintiff's request in a January 6, 2017 opinion and order. (Dkt. # 100, Pg. ID 3725.)

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the non-movant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

### III. DISCUSSION

Defendant argues that Plaintiff's medical malpractice and wrongful death claims fail as a matter of law because Plaintiff did not produce an expert report, as required by Ohio law to establish the relevant standard of care. (Dkt. # 88-1, Pg. ID 3579.) Defendant also argues that Plaintiff is judicially estopped from asserting that Defendant is responsible for Rodriguez's injuries because Plaintiff claims that CCA is responsible for Rodriguez's injuries in another proceeding. (Dkt. # 88-1, Pg. ID 3577.) Finally, Defendant argues that it is not vicariously liable for the actions of CCA employees because of the independent contractor exception to the FTCA. (*Id.* at 3580.) Because the court will find the failure to timely produce an expert fatal to Plaintiff's case, it will not address Defendant's other arguments.

Under the FTCA, a plaintiff must establish a viable claim under the law of the state in which the alleged negligent act took place. *Premo v. United States*, 599 F.3d 540, 545 (6th Cir. 2010); *see Molzof v. United States,* 502 U.S. 301, 305 (1992). Courts refer to the law of the state where the alleged act or omission occurred in order to determine liability under the FTCA. 28 U.S.C. § 1346(b)(1); *see also Premo*, 599 F.3d at 545. As all the alleged negligence took place at NEOCC, the court will apply Ohio substantive law here.

Plaintiff alleges that Rodriguez died because the care provided at NEOCC fell below the acceptable standard of medical care. (Dkt. # 42, Pg. ID 2433–34.) In order to

6

establish medical malpractice under Ohio law, a plaintiff must show: (1) the applicable standard of medical care; (2) Defendant's negligent failure to meet that standard; and (3) that Defendant's negligence proximately caused Plaintiff's injuries. *Rodriguez v. United States*, 2015 WL 5444804, at *2 (N.D. Ohio Sept. 15, 2015) (citing *Bruni v. Tatsumi*, 346 N.E. 2d 673, 677 (Ohio 1976)). Ohio law requires a plaintiff to offer expert testimony to prove that the defendant failed to adhere to the appropriate standard of care recognized by the medical community. *Lyons v. Brandly*, 430 F. App'x 377, 381 (6th Cir. 2011) (citing *Bruni*, 346 N.E. 2d at 677). "Failure to establish the recognized standards of the medical community is fatal to the presentation of a prima facie case of malpractice by the plaintiff." *Bruni*, 346 N.E.2d at 678 (internal quotation marks omitted). Expert testimony is similarly necessary to show proximate causation. *Ramage v, Central Ohio Emergency Serv., Inc.*, 592 N.E. 2d 828, 834 (Ohio 1992) ("Where the alleged [n]egligence involves the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patients injury."). This same requirement extends to a wrongful death action. *Radous v. Emeritus Corp.* 2013 WL 1283903, at *2 (N.D. Ohio Mar. 27, 2013) (citing *Torres v. Getzinger*, 983 N.E.2d 782, 789, at ¶ 22 (Ohio App. 7 Dist. 2012)). "The only exception to this rule is where the lack of skill or care is so apparent that only common knowledge and experience are required to understand and judge it." *Mooney*, 65 F. Supp. 2d 682, 684 (N.D. Ohio Aug. 27, 1999). Defendant contends that summary judgment is appropriate because Plaintiff cannot maintain its medical malpractice claim without an expert. (Dkt. # 88-1, Pg. ID 3579).

7

Plaintiff does not dispute the requirements of Ohio law, but instead asks the court to reconsider its denial of Plaintiff's previous motion to extend the deadline for expert reports. (Dkt. # 101, Pg. ID 3743). District courts possess the authority and discretion to reconsider interlocutory judgments at any time before final judgment. *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 952 (6th Cir. 2004) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983)). Courts do not favor motions for reconsideration unless the motion presents an intervening change of controlling law, new evidence, or a need to correct clear error to prevent manifest injustice. *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x at 959.

Plaintiff's request for reconsideration does not present a change of controlling law, new evidence, or a need to correct a clear error to prevent manifest injustice. Plaintiff reiterates that Defendant did not object to an extension. But the court already rejected this argument because only the court can grant extensions to scheduling orders. (Dkt. 100, Pg. ID 3274.) The only new information Plaintiff provides relates to a death in the family of their proffered expert, Dr. Jorge Calles-Escandon. (Dkt. # 101, Pg. ID 3745.) According to Plaintiff, this occurred in December 2016, well after the October deadline. (*Id.*) The court concludes that this event, while unfortunate, has little bearing on whether Plaintiff's failure two months prior was due to excusable neglect. The court considered and rejected Plaintiff's other arguments in its prior opinion (Dkt. # 100), and that reasoning still applies. As Plaintiff has not presented any other change of controlling law, new evidence, or need to correct a clear error, the court will not revisit its decision regarding the deadline for expert reports.

Under Ohio law, the failure to establish the recognized standard of medical care is fatal to a plaintiff's medical malpractice claim. *Bruni*, 346 N.E. 2d at 677. Plaintiffs must provide proof of the recognized standards of medical care, and breach of that standard, through expert testimony. *Id.* The same is true to show proximate causation. *Ramage*, 592 N.E. at 834. It is undisputed that Plaintiff has not produced such expert testimony, and will be unable to do so. As Defendant has demonstrated an absence of evidence necessary to support Plaintiff's prima facie case, Defendant is entitled to summary judgment. *See Bennett*, 410 F.3d at 817.

### IV.  CONCLUSION

IT IS ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 88) is GRANTED.

                                              s/Robert H. Cleland          /
                                              ROBERT H. CLELAND
                                              UNITED STATES DISTRICT JUDGE

Dated: April 6, 2017


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 6, 2017, by electronic and/or ordinary mail.

                                              s/Lisa Wagner          /
                                              Case Manager and Deputy Clerk
                                              (810) 292-6522